THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHA-BAZZ MUHAMMAD, Defendant-Appellant.

First District (3rd Division)   No. 1—90—2231

Opinion filed December 29, 1993.

Michael J. Pelletier and Pamela Z. O'Shea, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Brian Clauss, and Annette Milleville, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a bench trial, defendant, Shabazz Muhammad, was found guilty of four counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14), four counts of aggravated kidnapping (Ill. Rev. Stat. 1989, ch. 38, par. 10—2), and two counts of armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2). Defendant was sentenced to 30 years in the Illinois Department of Corrections for each count of aggravated criminal sexual assault, 20 years for each count of aggravated kidnapping and 20 years for each count of armed robbery to be served concurrently. We affirm in part, vacate in part and modify in part.

The issues before this court for review are: (1) whether defendant received ineffective assistance of counsel when defense counsel failed to file a motion to suppress his confession; (2) whether defendant was denied his right to a fair trial on the charge of aggravated criminal sexual assault where the State elicited certain allegedly irrelevant and inflammatory testimony from an arresting officer; (3) whether defendant's two convictions for the aggravated kidnapping of two different victims were based upon the same acts as his convictions for aggravated criminal sexual assault and armed robbery and must be vacated; (4) whether the trial court's sentence of 30 years for each count of aggravated criminal sexual assault was improper on the basis that the trial court failed to consider the requisite statutory sentencing factors, including defendant's potential for rehabilitation; and (5) whether defendant's sentence of 20 years for each count of aggravated kidnapping must be vacated and reduced because it exceeds the statutory maximum sentence.

Eighteen-year-old S.M. and seventeen-year-old S.W. testified that they walked to and purchased food from two fast-food restaurants in the vicinity of South Halsted and 113th Streets in Chicago, Illinois, on January 7, 1989. S.M. and S.W. testified that after purchasing their food, they walked past an alley near a "Dock's" fish restaurant on 113th Street. S.M. testified that upon crossing the alley, she looked back and saw defendant behind them. S.M. and S.W. both testified that they then crossed the street and that defendant followed them across the street and walked towards them. S.M. testified that as defendant approached them, he said: "You all bitches laughing at me,

and I'm going to laugh at you all." The victims testified that defendant then grabbed both of them by the collars of their coats with one hand, while he brandished a gun with the other.

S.M. and S.W. testified that after defendant grabbed their coats at gun point, he told both girls to walk down an alley situated between 112th and 113th Streets, to an abandoned garage. S.M. testified that there was no light in the garage but that the garage was illuminated by light from nearby streetlights. S.W. testified that after she, S.M. and defendant entered the garage, defendant hit her with a gun and instructed her to get into an abandoned car which was parked in the garage.

Both victims testified that defendant then took S.M. to the back of the car where the two talked. S.M. testified that she told defendant that she had just had a baby and that her body had not yet healed. S.M. told the court that defendant responded by instructing her to get into the car, which she did.

S.W. testified that defendant removed her from the car after S.M. got into the car. S.W. recalled that after she got out of the car, defendant escorted her behind the car, whereupon he instructed her to disrobe and to perform fellatio on him. S.W. testified that she complied. S.W. further testified that defendant placed her on the trunk of the car and attempted to engage in vaginal intercourse with her, but that his penis only touched her vagina without penetrating it. S.W. testified that defendant then ordered her to lie down on her coat, which was on the ground next to the car, and that she did so, whereupon she and defendant had intercourse. Defendant subsequently placed S.W. back inside of the car. S.W. then observed defendant take S.M. out of the car and escort her to the rear of the car.

S.M. testified that defendant was holding a gun when he instructed her to get out of the car and walk towards the rear of the automobile. S.M. testified that upon reaching the back of the car, defendant removed her shirt and sweater and then ordered her to take off the rest of her clothes. S.M. told the court that defendant subsequently ordered her to get on the trunk of the car where he had sexual intercourse with her. S.M. testified that when she and defendant got off of the trunk, defendant made her lie down on top of S.W.'s coat and perform fellatio on him.

S.M. testified that after removing his penis from her mouth, defendant left her and returned to the front of the vehicle where he spoke to S.W. S.M. stated that when he returned, he asked her if her leather coat was meant to be worn by a man or a woman. S.M. testified that she told defendant the jacket could be worn by a person of either gender. S.M. testified that defendant responded by striking her on the side of her head with his gun.

S.M. testified that defendant left her again and returned to the front of the car where he spoke to S.W. S.W. recalled that when defendant reached the front of the car, he told her that one of them had to die. S.M. testified that defendant returned to her after speaking to S.W. and then took her near S.M., whereupon he informed both victims that one of them would have to die. Subsequently, defendant took S.M. to the back of the car again where he pointed his gun at different parts of her body while he ridiculed her and threatened her. Thereafter, defendant ordered S.M. to remove her rings. S.M. removed all of her rings and gave them to defendant. Defendant was still holding the gun.

Defendant then ordered S.M. to get back into the car. Both victims testified that defendant took S.W. out of the car, whereupon he had intercourse with her on the floor of the garage for the second time. Defendant then ordered S.W. to get back into the car.

S.M. testified that while she and S.W. were together in the car, defendant told her that he was the "raper man," and that the police would never find him because he lived in Robert Taylor Homes. S.W. testified that defendant then took two silver chains, a gold chain and $2 in change from her.

Subsequently, defendant instructed the women to remain in the car until he left. When defendant left, he took the victims' jewelry, their food and S.M.'s leather jacket with him. Defendant also threw the victims' clothes outside of the garage. The entire ordeal lasted for approximately 1 1/2 hours.

After waiting for a few minutes, S.W. went outside and retrieved the clothes. The victims got dressed and obtained assistance from Clara Johnson, a resident of a nearby house located at 11232 South Union. Johnson called the police on behalf of the victims. The victims also showed Johnson the garage where they had been raped. The garage was located behind 11225 South Union. Both victims later identified defendant in a lineup on February 17, 1989, and during the trial.

Detective James Lolito of the Chicago police department testified that on the evening of February 17, 1989, he observed defendant following a woman who was walking down 114th Street near the intersection of 114th and Union. Detective Lolito testified that he turned his squad car around and followed defendant, whereupon defendant walked onto a porch at 11400 South Union. Detective Lolito stated that defendant appeared to ring the doorbell and that he subsequently walked towards the back of the house. Detective Lolito stated that he then stopped the squad car and that he and his partner, Detective John Gorman, got out of the car and identified

themselves to defendant as police officers. Detective Lolito testified that defendant responded by stating that his girl friend resided at 11400 South Union and that he and his girl friend had just had an argument and he was trying to make amends with her, but her father would not let him into the house. Detective Lolito testified that he then walked towards the house and defendant said: "Wait a minute. I don't have a girl friend that lives here. I just made up that story, I lied." Defendant was then arrested, placed in the squad car and read his *Miranda* rights. Defendant was also told that he was a suspect in several sexual assaults.

Detective Lolito testified that he and Officer Gorman did not ask defendant any questions, but that defendant while sitting in the squad car, made a statement regarding a previous sexual encounter that he had with another woman and he told the officers that he recently contracted a venereal disease after having sex with several women. Defense counsel objected to the admission of Detective Lolito's testimony about defendant's statement but the objection was overruled.

Detective Gorman testified that after he, his partner and defendant arrived at the Area 2 police station, defendant was read his *Miranda* rights again. Detective Gorman testified that defendant made a statement at approximately 7 p.m. in which he admitted raping one of the complainants in the garage. An assistant State's Attorney was then called, and Detectives Gorman and Lolito questioned defendant periodically until midnight. Detective Gorman testified that defendant was taken to the water cooler and fed McDonald's cheeseburgers during the evening. Detective Gorman testified that defendant was again advised of his *Miranda* rights by an assistant State's Attorney at midnight. Defendant then tendered a statement to the assistant State's Attorney which was recorded. After the statement was recorded, defendant read it and corrected it. Defendant also signed each page of the statement. At no time did defendant request a lawyer or ask to make a telephone call. Although defendant was only 16 years of age, he did not ask to call or to see his parents.

At trial, defense counsel objected to the admission of this statement on the basis that the statement was not made voluntarily. The trial court, citing section 114—11 of the Code of Criminal Procedure of 1963, which governs motions to suppress a confession (Ill. Rev. Stat. 1989, ch. 38, par. 114—11), refused to consider defense counsel's objection to the statement on the basis that defense counsel's failure to raise the issue of voluntariness prior to trial waived defendant's right to object. The statement in question was admitted into evidence.

Defendant was tried as an adult and found guilty of aggravated criminal sexual assault, aggravated kidnapping and armed robbery. Defendant was sentenced to 30 years in the Illinois Department of Corrections for each count of aggravated criminal sexual assault, 20 years for each count of aggravated kidnapping and 20 years for each count of armed robbery, to be served concurrently. Defendant now appeals.

Defendant contends on appeal that he received ineffective assistance of counsel when defense counsel failed to file a motion to suppress his confession. The State maintains that defendant received effective and competent representation, and that even if a motion to suppress had been filed, the outcome of the trial would have been the same. We agree.

The standard of quality for an attorney's advocacy is that of reasonably effective assistance pursuant to prevailing professional norms. (*Strickland v. Washington* (1984), 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693-94, 104 S. Ct. 2052, 2064-65.) In order for a conviction to be reversed on the basis of ineffective assistance of counsel, a defendant must demonstrate that defense counsel made errors so grave and that his performance was so deficient that he did not function in a manner commensurate with the sixth amendment standard for legal representation. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) In order to establish that defense counsel was so deficient, a defendant must overcome the strong presumption that the disputed action or inaction by defense counsel was merely trial strategy. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.) A review of a lawyer's competency will not extend to the exercise of his judgment, discretion, trial tactics and trial strategy. (*People v. Sowinski* (1986), 148 Ill. App. 3d 231, 246, 498 N.E.2d 650, 659.) Defense counsel's decision to file or not to file a motion is a matter of trial strategy. (*People v. Bryant* (1989), 128 Ill. 2d 448, 458, 539 N.E.2d 1221, 1226.) Even if a defendant is able to overcome the presumption that a disputed action or inaction was defense counsel's trial strategy and establish that his attorney's performance was deficient, he must also demonstrate that he was prejudiced by defense counsel's error (*Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65), and that there was a reasonable probability that but for said error, the fact finder would have had a reasonable doubt concerning his guilt. *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.

■ Upon viewing the totality of the circumstances, we find that defendant was not denied effective assistance of counsel when his attorney failed to make a pretrial motion to suppress his confession.

Defense counsel did not err in declining to file a motion to suppress defendant's confession because the record shows that defendant's confession was voluntary and, therefore, the outcome of the trial would not have been different if defense counsel had filed the motion.

The test for voluntariness is whether the statement was made freely and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed. (*People v. Clark* (1986), 114 Ill. 2d 450, 457, 501 N.E.2d 123, 126.) When determining whether or not a confession was given voluntarily, courts should look at the totality of the circumstances. *Clark*, 114 Ill. 2d at 457, 501 N.E.2d at 126.

In the present case, defendant was taken to the police station at approximately 6 p.m. whereupon he was read his *Miranda* rights. Defendant was questioned periodically between 6 p.m. and midnight, but he was not continuously interrogated. (See *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 402, 495 N.E.2d 984, 991.) Just prior to 7 p.m., defendant made a statement implicating himself in the crime. Between the time that defendant made his confession and the time he tendered his written statement, he was fed cheeseburgers from McDonald's and given water. The record also shows that defendant was allowed to use the bathroom and that he was given cigarettes to smoke. Defendant, after being advised of his *Miranda* rights again, signed a written waiver of his rights and represented that he could read and write English. Defendant's statement also acknowledged that he had not been threatened or abused. Defendant gave a written statement to an assistant State's Attorney around midnight.

Defendant argues that his confession was not voluntary because his parents were not informed of his arrest. The presence or absence of a parent is only one factor in determining whether a confession was voluntary within the totality of the circumstances. (*People v. Brown* (1989), 182 Ill. App. 3d 1046, 1051-52, 538 N.E.2d 909, 911-12.) Defendant in this case never asked to call or see his parents. Furthermore, a defendant does not have a *per se* right to consult with a parent before or during police questioning. (See *Brown*, 182 Ill. App. 3d at 1053, 538 N.E.2d at 912.) In support of his allegation, defendant also points to the fact that he was only 16 years of age at the time of his arrest. Age, however, is only one factor for consideration within the totality of the circumstances. (*People v. Abernathy* (1989), 189 Ill. App. 3d 292, 307, 545 N.E.2d 201, 211.) The record shows that defendant had not been threatened or abused prior to confessing and that he understood his *Miranda* rights. Furthermore, defendant was experienced with the law. Defendant was found guilty of robbery at the age of 12 as well as unlawful use of a weapon at age 15 and he

committed the crimes in question at the age of 16. See *Abernathy*, 189 Ill. App. 3d at 307, 545 N.E.2d at 211.

Accordingly, defendant has failed to overcome the presumption that defense counsel's inaction was the result of his trial strategy. An attorney's assistance is not *per se* ineffective because he declines to file a motion to suppress. (*People v. Deveaux* (1990), 204 Ill. App. 3d 392, 401-02, 561 N.E.2d 1259, 1265.) Trial counsel is not required to file futile motions in order to provide effective representation. (*People v. Lewis* (1981), 88 Ill. 2d 129, 156, 430 N.E.2d 1346, 1359.) The filing of a pretrial motion in this case would have been futile, as defendant's confession was voluntary and there was no evidence of misconduct on the part of the police. In addition, defendant has failed to show that he was prejudiced by defense counsel's inaction and that there was a reasonable probability that had defense counsel moved to suppress the confession, the trial court would have had a reasonable doubt with respect to his guilt.

Next, defendant alleges that he was denied his right to a fair trial on the charge of aggravated criminal sexual assault where the State elicited certain allegedly irrelevant and inflammatory testimony from the arresting officer.

During Detective Lolito's direct examination, the following colloquy occurred:

"THE STATE: Did the defendant make any statements to you?

DETECTIVE LOLITO: On the way in, while we had him in the squad car, I didn't ask him any questions. But I told him he was a suspect in this pattern of sexual assault. And he did make a comment that led us to believe that he knew something about one of these incidents.

THE STATE: And what did he tell you?

DETECTIVE LOLITO: He told me[:] 'If you are talking about the lady from Dock's the other day, I didn't rape her. I met her on the street. I walked up the street with her. We kicked it back and forth, and I tried to fuck her but I didn't get in.'

He also made a comment that he had been to a VD clinic earlier that day, and that he should be the person who was—I am not sure what word he used—mad or pissed off, because one of these bitches gave him a dose of the clap.

DEFENSE COUNSEL: Your Honor, I would object and ask that these statements be stricken from the record as not being relevant to this case.

THE COURT: Overruled."

Evidence that a defendant has committed other crimes or improper conduct is generally inadmissible unless it is relevant to a material fact at issue. (*People v. Hendricks* (1990), 137 Ill. 2d 31, 53,

560 N.E.2d 611, 620-21; *People v. Romero* (1977), 66 Ill. 2d 325, 329-30, 362 N.E.2d 288, 290.) Equally as well established, however, is the exception that the prosecution may present evidence probative of motive, intent, identity, absence of mistake or other material facts in issue even though such evidence discloses prior instances of uncharged misconduct by the defendant. (*Hendricks*, 137 Ill. 2d at 53, 560 N.E.2d at 620-21.) Furthermore, admissions made by a defendant may be admitted into evidence. An admission is a statement of independent fact which, when taken in connection with proof of other facts, may lead to an inference of guilt of the crime charged, but from which guilt does not necessarily follow. (*People v. Walters* (1979), 69 Ill. App. 3d 906, 919, 387 N.E.2d 1230, 1240.) A declaration that may not be sufficiently comprehensive to constitute a confession which is a direct acknowledgment of guilt on the part of the accused (*Walters*, 69 Ill. App. 3d at 919, 387 N.E.2d at 1240) may still constitute an admission. *People v. Houseton* (1986), 141 Ill. App. 3d 987, 994, 490 N.E.2d 1354, 1360.

■ In the present case, defendant voluntarily made the statements in question to the police after being advised of his *Miranda* rights and after he was advised that he was a suspect in a series of assaults. Defendant's statements were properly admitted into evidence as admissions probative of defendant's identity, as they indicate that defendant was in the area where the victims were attacked, that he attempted sexual relations with women in said area and that he knew that the victims might be angry at him because he sexually assaulted them.

The statement in question is also probative of defendant's "consciousness of guilt." Defendant made what he believed to be an exculpatory statement. False exculpatory statements have independent, probative value as evidence of consciousness of guilt. (*People v. Houseton* (1986), 141 Ill. App. 3d 987, 994, 490 N.E.2d 1354, 1360.) Just because defendant's false exculpatory statement was used against him at trial does not mean that he was denied a fair trial. Accordingly, defendant's conviction cannot be reversed on this basis.

Next, defendant contends that his two convictions for the aggravated kidnapping of two different victims should be vacated on the basis that said convictions were based upon the same acts as his convictions for aggravated criminal sexual assault and armed robbery. The State maintains that the aggravated kidnapping convictions must stand because they were separate and distinct offenses requiring different elements of proof and resulting from separate acts other than the aggravated criminal sexual assaults and the armed robberies. We agree.

A defendant who commits more than one criminal act in a criminal episode or transaction may be prosecuted and convicted for more than one offense. (*People v. Segara* (1988), 126 Ill. 2d 70, 77-78, 533 N.E.2d 802, 805-06.) The interrelationship of multiple acts precludes neither multiple convictions for offenses based upon said acts, nor the imposition of concurrent sentences therefor, so long as none of the offenses are lesser-included offenses. *Segara*, 126 Ill. 2d at 77-78, 533 N.E.2d at 805-06; see also *People v. Dixon* (1982), 91 Ill. 2d 346, 355-56, 438 N.E.2d 180, 185.

■ In the present case, the trial court did not err in punishing defendant separately for each crime perpetrated against the victims, including aggravated kidnapping, because each of defendant's convictions was based upon distinct acts which required different elements of proof. In order to be found guilty of aggravated criminal sexual assault, an accused must have committed sexual assault while armed. (Ill. Rev. Stat. 1989, ch. 38, par. 12—14.) Defendant committed the elements of this crime. Defendant penetrated each victim vaginally and forced them to perform fellatio upon him while he was armed with a gun.

Defendant was also properly convicted of armed robbery. In order for an accused to be convicted of armed robbery, he must have forcibly taken victims' property while armed with a dangerous weapon. (See Ill. Rev. Stat. 1989, ch. 38, par. 18—2.) Defendant's convictions for armed robbery were based upon his forcible taking of a coat, jewelry, money and food from the victims.

Although defendant may have kidnapped his victims in order to facilitate the commission of the sexual assaults and robberies, the aggravated kidnapping was a separate and distinct crime. An accused is guilty of aggravated kidnapping when while armed with a dangerous weapon he (1) knowingly and secretly confines another against his will or (2) with intent to secretly confine another person against his will, carries said person from one place to another by force or threat of imminent force. (Ill. Rev. Stat. 1989, ch. 38, pars. 10—1, 10—2.) Defendant's aggravated kidnapping convictions were based upon his act of forcing the victims to leave the street, walk down an alley and enter an abandoned garage. Thus, the aggravated kidnapping conviction was based on the element of asportation to the garage, while the aggravated criminal sexual assault convictions were based upon the sexual assault of the victims while armed with a gun, and the armed robbery convictions were based on the taking of the victims' property while armed with a gun.

Defendant's argument that he may not be convicted of multiple offenses because the asportation of the victims to the garage was nec-

essary to commit the other offenses is not persuasive (1) because defendant could have assaulted the victims in the street and (2) because asportation is not an element of aggravated criminal sexual assault or armed robbery. Accordingly, defendant's convictions for aggravated kidnapping are affirmed.

Defendant next alleges that the trial court's sentence of 30 years for each count of aggravated criminal sexual assault was improper on the basis that the trial court failed to consider the requisite statutory sentencing factors, including defendant's potential for rehabilitation. This contention is not borne out by the record.

Defendant correctly asserts that the 1970 Illinois Constitution provides that, when sentencing a defendant, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, § 11.) The Illinois Supreme Court, however, has mandated that the objective of restoring an offender to useful citizenship shall not be given greater consideration than the seriousness of the offense. *People v. Waud* (1977), 69 Ill. 2d 588, 596, 373 N.E.2d 1, 4.

■ The record in the present case shows that the trial judge considered defendant's rehabilitative potential and found it to be lacking, and that he properly balanced the objective of rehabilitation against the seriousness of the offense. The record, in relevant portion, reads as follows:

"I have said a number of times from the bench, *** that sentencing is the most difficult part of being a judge.

The reason that it is difficult is because we recognize how it impacts on the lives of the persons who are being sentenced and on the lives of families, the lives of the victims of their crimes, and on the public at large.
***

And when I look at this defendant to see whether there is anything at all there to mitigate this offense, what I am told is, and what is true is his age. And age, I suppose, is a mitigating factor.

It is hoped that as [defendant] matures; that his approach to life will also soften; that he will garner a measure of self respect, which will enable him, hopefully, to respect others.

But his age does not in anyway, in my judgment, diminish the heinousness of this crime. He knew and was old enough to know and was mature enough to know precisely what he was doing.
* * *

I'm not terribly excited by his juvenile offenses. At age twelve, he was adjudicated a delinquent because of the commission of the

offense of robbery. At age fifteen he was adjudicated a delinquent, apparently, by having committed the offense of intimidation and unlawful use of a weapon with a knife and was sent to the Juvenile Division of the Illinois Department of Corrections.

He's been involved with criminal activity almost since he got out of the crib. The reason for that, I'm not sure of. Whether it is sociological, psychological, I don't know. Whether it can be overcome, I do not know. I suspect and suggest that if it can be overcome it will be in spite of the penitentiary and not because of it.

But as I suggested, I'm not concerned about rehabilitating [defendant]. I'm more concerned about isolating him from those of us who raise children \*\*\* and who expect a reasonable sense of security.

\*\*\*

And I read his pre-sentence report as carefully as any that I have read since I have been sitting here, trying to find something that would redeem this otherwise maximal heinous offense, find a way to say to myself and to the public that this offense is one which ought not to carry a maximum penitentiary sentence. And the only thing that is in it at all is the fact that he was sixteen years old at the time of the commission of this offense. But his victims were young girls also. One was sixteen, one was seventeen."

The record reflects that the trial judge reached his decision regarding defendant's sentences after a great deal of careful thought and deliberation.

The record also shows that the trial judge complied with sections 5—4—1(a), 5—5—3.1 and 5—5—3.2 of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—4—1(a), 1005—5—3.1, 1005—5—3.2), by reading the presentence investigation report and considering factors in aggravation and mitigation. A trial judge is in the best position to determine an appropriate sentence for a defendant. (*People v. Jenkins* (1991), 209 Ill. App. 3d 249, 264, 568 N.E.2d 122, 132.) For this reason, a trial court's decision with respect to sentencing is entitled to great deference and weight. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344, 348-49.) Accordingly, we affirm the trial court's imposition of 30-year sentences for each count of aggravated criminal sexual assault.

Finally, defendant maintains and the State concedes that his sentence of 20 years for each count of aggravated kidnapping should be reduced to 15 years.

■ Under the law in effect at the time defendant committed the offenses, aggravated kidnapping other than ransom was a Class 1

felony punishable by a nonextended term of 4 to 15 years' imprisonment. (Ill. Rev. Stat. 1989, ch. 38, pars. 10—2(b)(2), 1005—8—1(a)(4).) Defendant's 20-year sentences for aggravated kidnapping other than ransom exceeds the maximum permissible sentence by four years. Therefore, we must vacate defendant's sentences for aggravated kidnapping. We have the authority to reduce the punishment imposed upon a defendant by the trial court. (134 Ill. 2d R. 615(b)(4).) It is clear from the sentencing record, which we cited above, that the trial judge intended to sentence defendant to the maximum sentence for each offense, including aggravated kidnapping. Accordingly, we modify defendant's sentence for both counts of aggravated kidnapping to 15 years in compliance with the statutory maximum sentence for said crime.

We affirm defendant's convictions and sentences for aggravated criminal sexual assault and armed robbery. We vacate defendant's sentences for aggravated kidnapping and modify said sentences to 15 years.

Affirmed in part; vacated in part and modified in part.

TULLY, P.J., and CERDA, J., concur.